1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

EASTERN DISTRICT OF CALIFORNIA

10

11

RYAN BIGOSKI ODOM,

12

Plaintiff,

13

v.

14

J. TAYLOR, et al.,

15

Defendants.

Case No. 1:20-cv-01120-KES-CDB (PC)

**FINDINGS AND RECOMMENDATIONS TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(Doc. 42)

<u>14-Day Deadline</u>

16

17        Plaintiff Ryan Bigoski Odom is a state prisoner proceeding pro se and *in forma pauperis*

18   in this civil rights action. This action proceeds on Plaintiff's Eighth Amendment deliberate

19   indifference to serious medical needs claims against Defendants Taylor, Khoo, Attinello,

20   Ezenwugo, Mitchell and Singh.

21        **I.        INTRODUCTION**

22        On August 28, 2024, Defendants filed a motion for summary judgment concerning the

23   merits of Plaintiff's claims. (Doc. 42.) The motion included a *Rand*[1] warning (Doc. 42-3),

24   addressing the requirements concerning an opposition to a motion for summary judgment.

25        On October 3, 2024, the Court issued its Order to Show Cause (OSC) Why Sanctions

26   Should Not Be Imposed for Plaintiff's Failure to File an Opposition or Statement of Non-

27   Opposition to the summary judgment motion. (Doc. 43.) Plaintiff was directed to show cause in

28

---

[1] *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998).

writing within 14 days why sanctions should not be imposed for her failure to respond to Defendants' summary judgment motion, or, alternatively, to file an opposition or statement of non-opposition to Defendants' motion for summary judgment. (*Id.* at 2-3.)

On October 11, 2024, Plaintiff filed a document titled "Decleration," docketed as an opposition to the motion for summary judgment. (Doc. 44.) Defendants filed the Declaration of Eric Miersma in Response to Plaintiff's Declaration re Defendants' Motion for Summary Judgment (Doc. 45) on October 24, 2024.

On October 28, 2024, the Court issued its Order Discharging Order to Show Cause, Order Denying Request to Reopen Discovery, and Order Granting Extension of Time Within Which to File Opposition to Motion for Summary Judgment. (Doc. 46.) In relevant part, Plaintiff was granted an additional 30 days, from the date of service of the order, within which to file an opposition to Defendants' summary judgment motion. (*Id.* at 5-6.)

Plaintiff did not file an opposition to Defendants' motion for summary judgment and the time to do so has passed. Thus, because a reply is unnecessary, the Court deems the motion submitted. Local Rule 230(*l*).

## II.   APPLICABLE LEGAL STANDARDS

### *Motions for Summary Judgment*

Summary judgment is appropriate when it is demonstrated that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Washington Mutual Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials...." Fed. R. Civ. P. 56(c)(1)(A).

Summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See*

1    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[A] complete failure of proof concerning an

2    essential element of the nonmoving party's case necessarily renders all other facts immaterial."

3    *Id.* If the moving party meets its initial responsibility, the burden then shifts to the opposing party

4    to establish that a genuine issue as to any material fact actually does exist. *See Matsushita Elec.*

5    *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). In attempting to establish the

6    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7    of their pleadings but is required to tender evidence of specific facts in the form of affidavits,

8    and/or admissible discovery material, in support of its contention that the dispute exists or shows

9    that the materials cited by the movant do not establish the absence of a genuine dispute. *See* Fed.

10   R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the

11   fact in contention is material, i.e., a fact that might affect the outcome of the suit under the

12   governing law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986); *T.W. Elec. Serv.,*

13   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Further, the opposing

14   party must also demonstrate that the dispute is genuine, i.e., the evidence is such that a reasonable

15   jury could return a verdict for the nonmoving party. *See Wool v. Tandem Computers, Inc.*, 818

16   F.2d 1433, 1436 (9th Cir. 1987). In seeking to establish the existence of a factual dispute, the

17   opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient

18   that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

19   differing versions of the truth at trial." *T.W. Elec. Serv*., 809 F.2d at 631. Thus, the "purpose of

20   summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there

21   is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

22   committee's note on 1963 amendments).

23       In resolving the summary judgment motion, the evidence of the opposing party is to be

24   believed. *See Anderson*, 477 U.S. at 255. All reasonable inferences that may be drawn from the

25   facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475

26   U.S. at 587. Nevertheless, "inferences are not drawn out of thin air" and it is the opposing party's

27   obligation to produce a factual predicate from which the inference may be drawn. *See Richards v.*

28   *Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

1   Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

2   show that there is some metaphysical doubt as to the material facts.... Where the record taken as a

3   whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine

4   issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

5   *Eighth Amendment Deliberate Indifference to Serious Medical Needs*

6   Prison officials violate the Eighth Amendment if they are "deliberate[ly] indifferen[t] to [a

7   prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "A medical need

8   is serious if failure to treat it will result in '"significant injury or the unnecessary and wanton

9   infliction of pain.""' *Peralta v. Dillard*, 744 F.3d 1076, 1081-82 (9th Cir. 2014) (quoting *Jett v.*

10  *Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059

11  (9th Cir. 1992), overruled on other grounds by *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th

12  Cir. 1997) (en banc)).

13  To maintain an Eighth Amendment claim based on medical care in prison, a plaintiff must

14  first "show a serious medical need by demonstrating that failure to treat a prisoner's condition

15  could result in further significant injury or the unnecessary and wanton infliction of pain. Second,

16  the plaintiff must show the defendants' response to the need was deliberately indifferent."

17  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (quoting *Jett*, 439 F.3d at 1096

18  (quotation marks omitted)).

19  As to the first prong, indications of a serious medical need "include the existence of an

20  injury that a reasonable doctor or patient would find important and worthy of comment or

21  treatment; the presence of a medical condition that significantly affects an individual's daily

22  activities; or the existence of chronic and substantial pain." *Colwell v. Bannister*, 763 F.3d 1060,

23  1066 (9th Cir. 2014) (citation & internal quotation marks omitted); accord *Wilhelm*, 680 F.3d at

24  1122; *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) ("Examples of serious medical needs

25  include '[t]he existence of an injury that a reasonable doctor or patient would find important and

26  worthy of comment or treatment; the presence of a medical condition that significantly affects an

27  individual's daily activities; or the existence of chronic and substantial pain").

28  As to the second prong, deliberate indifference is "a state of mind more blameworthy than

4

negligence" and "requires 'more than ordinary lack of due care for the prisoner's interests or safety.'" *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Thus, deliberate indifference is shown where a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id*. at 847. In medical cases, this requires showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122 (quoting *Jett*, 439 F.3d at 1096). "A prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096, citing *McGuckin*, 974 F.2d at 1060.

Deliberate indifference is a high legal standard. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Although the state of mind for deliberate indifference commonly is characterized as "subjective recklessness," that standard is "less stringent in cases involving a prisoner's medical needs ... because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (internal quotations and citations omitted). "Under this standard, the prison official must not only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Id*. at 1057 (quoting *Farmer*, 511 U.S. at 837). "'If a prison official should have been aware of the risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk.'" *Id*. (quoting *Gibson v. County of Washoe, Nevada*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

To prevail on a deliberate-indifference claim, a plaintiff must also show that harm resulted from a defendant's wrongful conduct. *Wilhelm*, 680 F.3d at 1122; *see also Jett*, 439 F.3d at 1096; *Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (prisoner alleging deliberate indifference based on delay in treatment must show delay led to further injury).

### III.   PLAINTIFF'S CLAIMS

In the operative second amended complaint, Plaintiff alleges as follows:

///

Plaintiff contends she suffers from osteoarthritis and degenerative joint disease in her left hip, a one and one-half inch length discrepancy in her left hip, scoliosis of her spine, HIV induced neuropathy and carpel tunnel syndrome. She has experienced severe and increasing pain throughout her body during her incarceration at the Central California Women's Facility (CCWF).

Plaintiff alleges all named Defendants knew of her worsening joint and bone pain because she filed several grievances, imaging results were obtained, and assessments performed by the primary care physicians. Plaintiff notes Defendants Mitchell and Singh "have been aware and reviewed [her] medical issues on more than one occasion." Plaintiff contends none of the named Defendants "did anything to delay the progress" of her disorder, placing her at substantial risk of injury for a total hip replacement at a young age. Plaintiff received a total hip replacement after being sent to a physician for a cortisone injection in August 2019, only to be refused the procedure because the doctor reviewed her x-rays and advised Plaintiff that she had no hip joint the doctor could "inject into." Orthopedic practitioners who reviewed the "same x-ray images that all 6 defendants have seen" were surprised Plaintiff could even walk. Plaintiff contends her pain was never controlled and the progress of her disorder was never delayed, resulting in her need to have replacement surgery at forty years old. Plaintiff asserts her mobility and function "only worsened, never did it improve."

Plaintiff contends Defendants Taylor, Khoo, Antenello and Eznewugo were aware of "each and every medication" Plaintiff has been prescribed because Plaintiff discussed it with them verbally and referenced the medications in grievances and other medical forms. However, they continued to prescribe the same medications, including two on her "allergy list," putting Plaintiff at a substantial risk of serious harm. Plaintiff contends Ibuprofen and Naproxen "were definitely medically unacceptable" for her type of pain as she had previously explained to these medical providers that she had been treated with Ibuprofen and Naproxen for several years prior to her incarceration but neither helped any longer. Plaintiff asserts she suffered physical and mental harm because her pain was not controlled. Plaintiff contends she has suffered from severe depression for more than two years, and the Ibuprofen and Naproxen have caused kidney function issues and "put [her] other organs at substantial risk" because she is HIV positive.

Plaintiff asserts Defendants Mitchell and Singh both have the authority to grant her the use of a double mattress or egg crate. She contends her disease was significant enough in 2014 or 2015 to justify a double mattress, and that as her disease continues to progress, denials of her requests for a double mattress or egg crate are medically unacceptable.

In conclusion, Plaintiff contends her health issues are "discussed daily at the morning medical meetings that all" named Defendants attend and all of her medical issues are known to them. Plaintiff asserts her hip replacement did not address her chronic pain because she still suffers from osteoarthritis in other areas of her body,

1    including her back, and has HIV induced neuropathy and carpal
2    tunnel.

3   (*See* Doc. 21 at 3-5, citations omitted.) The undersigned found:

4        Plaintiff's allegations satisfy the first, objective prong. Plaintiff
5        suffers from several medical conditions—osteoarthritis and
         degenerative joint disease in her left hip, a one and one-half inch
         length discrepancy in her left hip, scoliosis of her spine, HIV induced
6        neuropathy and carpel tunnel—that significantly affect her daily
7        activities. And as the Court has determined in a prior screening order,
         it is clear Plaintiff's medical conditions caused her significant pain
8        and were worthy of treatment.

9        Liberally construing the second amended complaint, Plaintiff has
         plausibly alleged facts to satisfy the second, subjective prong. Her
10       allegations plausibly demonstrate a failure by all named Defendants
         to respond to Plaintiff's serious medical needs concerning the
11       progression of her disease and pain control, and further, that
         Defendants Taylor, Khoo, Antenello and Eznewugo were aware of
12       Plaintiff's previous adverse and allergic reactions to Ibuprofen and
         Naproxen or their generic counterparts, subjecting her to substantial
13       risk of harm.

14       As concerns Defendants Mitchell and Singh and Plaintiff's requests
         for a double mattress or egg crate, liberally construing the second
15       amended complaint, Plaintiff has plausibly alleged Mitchell and
         Singh chose to deny her a double mattress and/or egg crate despite
16       having knowledge of her serious medical conditions and the relief
         either a double mattress or egg crate would have afforded, amounting
17       to a medically unacceptable choice made in conscious disregard of
         an excessive risk to Plaintiff's health due to their failure to take
18       reasonable measures to abate that risk.

19   (*Id.* at 6-7.)

20   ## IV.   DEFENDANTS' STATEMENT OF UNDISPUTED FACTS[2] (Doc. 42-4)

21       1.   Plaintiff Ryan Odom is a state-prison inmate incarcerated at Central California

22   Women's Facility ("CCWF") at the time of the incidents alleged in her SAC.

23       2.   In approximately 1989, at the age of 9, Odom broke her left hip on a merry-go-round.

---

24   [2] Because Plaintiff did not file an opposition, she neither admitted or denied the facts set forth by Defendants as
25   undisputed nor filed a separate statement of disputed facts. Local Rule 260(b). A verified complaint in a pro se civil
     rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is
     based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. *Jones v.*
26   *Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); Fed. R. Civ. P. 56(e). Here, because Plaintiff has not complied with Rule
     260(b), the Court deems Plaintiff to have admitted those facts not disputed by her complaint or other submissions.
27   *See, e.g., Beard v. Banks*, 548 U.S. 521, 527 (2006) ("by failing specifically to challenge the facts identified in the
     defendant's statement of undisputed facts, [plaintiff] is deemed to have admitted the validity of the facts contained in
28   the [defendant's] statement"); *Brito v. Barr*, No. 2:18-cv-00097-KJM-DB, 2020 WL 4003824, at *6 (E.D. Cal. July
     15, 2020) (deeming defendant's undisputed facts as admitted after plaintiff failed to comply with Local Rule 260(b)).

She had 7 surgeries on her left hip between the ages of 9 and 12. Odom states her left leg is now about an inch shorter than her right leg and she uses a shoe insert to compensate. She further states that in 2010, approximately three years prior to arriving at CCWF, she was in a motorcycle accident from which she sustained a traumatic brain injury.

3.   Odom first entered CCWF on November 13, 2013.

4.   On December 13, 2013, Odom saw nondefendant Nurse Practitioner Loadholt who performed an intake history and physical examination. NP Loadholt checked the box NKA, meaning no known drug allergies, and then added in parentheses that Odom reported that codeine and morphine gave her stomach cramps and dizziness. NP Loadholt documented "this is intolerance," or unpleasant side effect, rather than an allergic reaction to medication.

5.   On January 9, 2014, Odom saw nondefendant Dr. Gonzalez for a Form #602 healthcare grievance with six requests: to see orthotics for her leg length discrepancy; to receive pain medication for her left hip; to have a left hip replacement; to receive a double mattress; to receive soft shoes; and to receive an extra blanket. It is unclear why Odom filed a grievance for these items that she had not previously requested nor been denied. Dr. Gonzalez referred Odom to orthotics for her leg length discrepancy and to orthopedic surgery to be evaluated for possible hip replacement. Dr. Gonzalez prescribed Tylenol #3, which is Tylenol plus codeine, to be used as needed for pain. Dr. Gonzalez also documented that Odom "does not meet the criteria for a double mattress, soft shoes, or an extra blanket."

6.   On February 6, 2014, Odom saw nondefendant Dr. Romero after submitting another Form #602 healthcare grievance with the same six requests. Dr. Romero noted that the orthotic and orthopedic referrals were in progress, that the pain issue was a duplicate with no answer per the appeals department, and reiterated that Odom did not meet criteria for a double mattress, soft shoes, or an extra blanket.

7.   On February 11, 2014, Odom saw nondefendant Dr. Galang for a telemedicine

8

orthopedic consultation. Dr. Galang's impression was that Odom had "severe degenerative arthritis of the left hip with some shortening. Due to her age, it is best to treat it conservatively. She will need a total hip replacement in the future."

8. On February 12, 2014, Odom was seen in the orthotics department for her left length discrepancy where size 9-1/2 shoes with a left heel lift were ordered.

9. On February 19, 2014, Odom saw Defendant NP Ezenwugo for the first time. NP Ezenwugo reviewed the recent orthopedic and orthotic consultations. Odom requested an eggcrate mattress and was once against told there was "no indication at this time." In response to Odom's complaint that the Tylenol #3 was not working for her pain, NP Ezenwugo increased the prescription from 1 tablet twice a day to 2 tablets twice a day.

10. Between March 12, 2014, and November 18, 2014, Odom saw medical staff multiple times regarding her orthopedic shoes with heel lift and ultimately refused further appointments with the orthotics department stating that she was "happy with the product" and she was already wearing the proper shoe lifts. During this time period, Odom also made multiple requests for an eggcrate mattress but was denied because there was no indication for one. As noted above, she did not qualify for a double mattress because she was ambulatory with a body mass index of less than 30. Medical staff did grant her request for a wedge pillow and a TENS unit, a machine that uses transcutaneous electrical nerve stimulation in an attempt to block or change one's perception of pain.

11. On July 6, 2015, Odom saw NP Ezenwugo for follow-up of her chronic medical conditions. Regarding her chronic pain, Odom noted nortriptyline, which appeared to have been started for her HIV neuropathy, was causing her to have panic attacks, and she felt that she would do better with an increase in the Tylenol with codeine. NP Ezenwugo obliged that request.

12. Between July 14, 2015, and August 10, 2015, Odom saw nondefendant Dr. Harris four times. Dr. Harris changed her medication from nortriptyline to Trileptal, and then changed again to Tegretol when Odom reported having nausea and headaches. Dr.

Harris referred her for an orthopedic follow-up, but the referral for surgery was denied because of incomplete information. The denial noted, "What conservative treatment has tried in this young patient before considering hip replacement."

13. On August 21, 2015, Odom saw nondefendant Dr. Mudunuri regarding her chronic pain. Odom reported that Tegretol made her dizzy and nauseated and Dr. Mudunuri replaced it with gabapentin.

14. Between September 8, 2015, and June 13, 2016, NP Ezenwugo saw Odom multiple times for the denial of her referral to orthopedic surgery and for her chronic pain. NP Ezenwugo informed Odom of the denial and reminded her that when seen by Dr. Galang of orthopedic surgery the prior year he had stated that hip replacement was not indicated at that time due to her age. Odom reported that the gabapentin was helpful for her nerve pain, but not her other pains. In response, NP Ezenwugo first added Salsalate to take as needed for pain, and then changed to Tylenol with codeine at Odom's request. On June 13, 2016, Odom reported that she did "not want any further pain control" and requested a referral to the orthotics department to adjust her orthotics. NP Ezenwugo referred Odom as requested.

15. On July 19, 2016, Odom was seen in the orthotics department where a new left heel lift was provided. The orthotist also suggested that Odom might benefit from a physical therapy referral.

16. On August 2, 2016, Odom saw nondefendant Dr. Dhaliwal regarding her chronic pain. Dr. Dhaliwal noted the recommendation for a physical therapy referral and submitted the order. Dr. Dhaliwal also documented that Odom said she had reported having an allergy to morphine when she was incarcerated, but that she would like that allergy to be removed from her record. Odom stated that morphine caused her to get some nausea and bloating but no other side effects. Dr. Dhaliwal documented that he would remove her listed allergy to morphine at her request after she explained that she did not have any allergic reactions to morphine, just mild side effects.

17. On October 12, 2016, Odom saw Defendant Dr. Khoo for the first time. Regarding her

1  chronic pain, Dr. Khoo confirmed with scheduling staff that Odom was approved for

2  and awaiting her appointment with physical therapy.

3  18. On November 8, 2016, Odom was seen in the physical therapy department at San

4  Joaquin General Hospital. Only brief handwritten notes were returned to her, which

5  indicated plans for her to be seen weekly for 4 weeks.

6  19. On November 22, 2016, Odom saw Dr. Khoo for follow-up. Regarding her chronic

7  left hip pain, Odom reported it as "mild." On physical exam, Dr. Khoo noted that there

8  was no discrepancy of leg length when Odom was standing up with her orthotic shoes

9  with lifts in place, and no significant tenderness over the left hip area as well as no

10  swelling or redness. Dr. Khoo documented that Odom did not want the medication and

11  the plan was to continue physical therapy and follow-up thereafter.

12  20. On January 3, 2017, Odom saw Dr. Khoo for follow-up after she had been discharged

13  from physical therapy. They discussed that Odom had had significant improvement

14  from physical therapy with good range of motion, strength, and mobility. However,

15  Odom requested adjustments to her orthotics and orthotic shoes, and Dr. Khoo

16  submitted a referral to the orthotics department. The Orthotics department measured

17  Odom for new orthotics on January 17, 2017. Odom saw Dr. Khoo for a follow-up on

18  February 2, 2017, and had no complaints. On February 21, 2017, Odom's orthotics

19  were delivered to her, and it was documented that the fit and function were good.

20  21. On May 18, 2017, Odom saw NP Ezenwugo for the final time, for review of her

21  chronic medical conditions. Regarding her chronic left hip and back pain, "patient

22  states her back and left hip no longer bother her since she received insert in her shoe."

23  Of note, NP Ezenwugo included in this documentation results of recent lab work from

24  March 30, 2017, which included a creatinine of 0.87 mg/dL, consistent with normal

25  kidney function.

26  22. On June 18, 2018, Odom saw Defendant NP Attinello for the first time, for a review of

27  her chronic medical conditions. Regarding her chronic left hip pain, NP Attinello

28  documented that Odom had been provided a shoe lift one year ago and that she was

"happy with the lift." NP Attinello also noted that Odom had been started on the medication duloxetine 20 mg daily for chronic pain and that Odom verbalized a positive response to that medication and requested it be increased. NP Attinello obliged the request, increasing the medication to 20 mg twice a day.

23. On November 15, 2018, Odom saw NP Attinello for follow-up of her chronic left hip pain. Odom informed NP Attinello that "she is satisfied with ibuprofen, Tylenol, gabapentin for pain management. She uses TENS unit for her back." Odom was restarting physical therapy and the plan was to return to clinic when physical therapy sessions were completed.

24. On or about April 18, 2019, CCHCS issued a memorandum stating that the Systemwide Pharmacy and Therapeutics Committee reviewed patient safety concerns and noted that recent articles had questioned the safety of gabapentin and urging healthcare providers to limit prescribing gabapentin to its FDA-approved indications, none of which Odom had.

25. On May 6, 2019, Odom saw NP Attinello for follow-up of several issues. Regarding her chronic pain, Odom stated that the gabapentin 600 mg three times daily was helpful but felt it was not enough and was asking for an increase in her dose. NP Attinello increased the gabapentin prescription to 800 mg three times a day.

26. On May 21, 2019, NP Attinello entered a brief note that states in its entirety: "Patient was placed on line requesting eggcrate and wedge pillow. Patient verbalizes understanding that she does not meet criteria for wedge pillow. She does not have GERD nor is she postsurgical. Eggcrate mattresses are no longer available through the department."

27. In her SAC, Odom complains about her pain medication damaging her kidneys.

28. NP Attinello included in her June 18, 2018, documentation the results of recent lab work from April 25, 2018, which included a creatinine of 0.90 mg/dL, as well as a GFR (non African American) of 81 mL/min, both studies consistent with normal kidney function. Also included were the results of urine studies from May 15, 2018,

including a urine creatinine of 126 mg/dL and urine microalbumin of 0.9 mg/dL. These studies are not diagnostic in and of themselves, but combined into the urine microalbumin/creatinine ratio, it provides useful information regarding the amount of protein the kidneys are spilling into the urine. Here the result was 7mcg/mg creatinine. Any number less than 30 mcg/mg is normal.

29. On May 24, 2019, Odom saw NP Attinello for follow-up of her chronic medical conditions. Regarding chronic hip pain, NP Attinello documented that Odom had completed physical therapy, and reported that the pain was controlled with the 800 mg of gabapentin three times daily. NP Attinello continued the gabapentin but instructed Odom to "stop ibuprofen related to microalbuminuria." This appears to be based on labs from May 22, 2019, where the urine microalbumin was higher than previous values at 2.9 mg/dL. However, the urine creatinine from this sample was also higher than previous values at 295 mg/dL. Essentially, this indicates that the urine sample was more concentrated, suggesting that Odom was more dehydrated than when she gave previous samples.

30. Accounting for the variation attributable to hydration status is the purpose of looking at microalbumin levels in relationship to creatinine levels. In other words, by comparing microalbumin levels to creatinine levels, the urine microalbumin/creatinine ratio adjusts for urine concentration, making the measurement more reliable. When done so here, the result is 10 mcg/mg, once again well below the normal range of less than 30. NP Attinello's apparent misinterpretation of this elevation in urine microalbumin levels as indicative of kidney damage, when in fact there was none, and subsequent discontinuation of ibuprofen, appears to be the basis of Odom's erroneous claim on page 9 of her Second Amended Complaint that ibuprofen caused her kidney function to be impaired.

31. Dr. Feinberg generated a flowsheet for Odom's urine microalbumin to creatinine ratios from the relevant date range of January 1, 2013 through October 7, 2021. These values ranged between four and 10, all well below the normal range of less than 30. Dr.

1    Feinberg similarly generated a flowsheet for Odom's creatinine levels, the most

2    commonly used marker of kidney function, where the normal range is between 0.5 and

3    1.1, during the same relevant timeframe. Odom's values ranged from 0.79-0.99, once

4    again all well within the normal range.

5    32. On June 25, 2019, Odom saw NP Attinello for the final time. On physical

6    examination, NP Attinello noted that Odom "maneuver at [sic] up and off the

7    examination table independently and without apparent difficulty." NP Attinello

8    performed measurements of the distance from Odom's trochanters to her lateral

9    ankles, and determined that the lengths were equal bilaterally, which Odom

10   determined was "inconsistent with the patient's notion that she has leg length

11   discrepancy." Whether or not this determination was correct, NP Attinello does not

12   appear to have withdrawn any treatment in response, nor otherwise adversely affected

13   Odom. Rather, NP Attinello ordered new x-rays of Odom's hips and referred Odom

14   back to physical therapy. NP Attinello did discuss with Odom tapering off of

15   gabapentin "related to its poor safety profile and statewide mandates." This appears to

16   refer to the CCHCS memorandum discussed above. NP Attinello documented that

17   Odom agreed with tapering off the gabapentin, and requested to retry the pain

18   medication Naprosyn, which NP Attinello obliged.

19   33. On July 5, 2019, Odom saw Defendant Dr. Taylor for the first time. This visit was

20   primarily for Odom's complaints of left hand and left big toe cramping and numbness.

21   Odom did not raise any issues regarding her left hip osteoarthritis and pain though Dr.

22   Taylor noted it could be one of many causes of Odom's left toe numbness. Dr. Taylor

23   treatment plan was to consider physical therapy and/or new shoe inserts.

24   34. On July 9, 2019, Odom saw Dr. Taylor specifically for follow-up of her chronic left

25   hip pain. Dr. Taylor created and reviewed a more detailed history of Odom's chronic

26   hip pain and noted that a steroid injection had not yet been tried. Dr. Taylor submitted

27   a referral to orthopedic surgery for further evaluation of her chronic left hip pain,

28   including the consideration of a possible ultrasound-guided left hip steroid injection.

1    Thus, four days after first seeing Odom, Dr. Taylor referred her to an orthopedic

2    surgeon.

3    35. On July 11, 2019, Defendant Dr. Singh approved the above request for an orthopedic

4    surgery consultation.

5    36. On July 25, 2019, Odom saw nondefendant Dr. Castonguay for an orthopedic surgery

6    consultation. Dr. Castonguay listed as Odom's chief complaint "new patient here for

7    left hip pain." After obtaining a history of Odom's left hip condition, and performing a

8    physical examination noting that Odom's "left leg is minimally shorter" than her right

9    leg, Dr. Castonguay recommended that Odom be referred "to a tertiary care center for

10    total hip replacement of the left hip. She has had at least 7 surgeries for this hip and

11    will need specialty care for replacement." Dr. Castonguay did not document any

12    opinion regarding a possible left hip injection.

13    37. Between August 6, 2019, and September 20, 2019, Odom saw Dr. Taylor multiple

14    times. Dr. Taylor changed her pain medication to Lyrica, and noted the referral for

15    tertiary care for her hip. Dr. Singh initially denied the request tertiary care requesting

16    more information, but on September 20, 2019, granted the request after Dr. Taylor

17    provided more information.

18    38. On October 9, 2019, Odom was seen by Dr. Ellis in the orthopedic surgery clinic at

19    the Riverside University Health System for the above requested tertiary care center

20    evaluation for possible total hip replacement. After obtaining a history of Odom's left

21    hip and performing a physical exam, Dr. Ellis diagnosed Odom with posttraumatic

22    osteoarthritis of the left hip. Dr. Ellis recommended a total hip replacement.

23    39. On October 22, 2019, Odom saw Dr. Taylor for follow-up. Dr. Taylor reviewed the

24    above orthopedic surgery recommendation and submitted a request for total hip

25    replacement. At Odom's request, Dr. Taylor also began tapering her off of the Lyrica.

26    40. On November 6, 2019, the total hip replacement was approved, and on November 18,

27    2019, Dr. Taylor began a trial of carbamazepine 200 mg twice daily for her chronic

28    pain.

41. On December 4, 2019, Odom was seen by Dr. Ellis in the orthopedic surgery clinic at the Riverside University Health System for follow-up after approval of total hip replacement surgery. A preoperative assessment was scheduled for December 19, 2019, and the total hip replacement surgery was planned for December 30, 2019. However, Odom refused to go to the preoperative assessment because her children were coming to visit her, and she wanted to schedule the surgery for after the holidays. The preoperative assessment took place on January 9, 2020, and the total hip replacement surgery took place on January 27, 2020.

42. Between February 5, 2020, and February 19, 2020, Odom left the prison for weekly follow-up appointments at Riverside University Health System and continued to recover well.

43. On June 5, 2020, Odom was seen in the orthopedic surgery clinic at the Riverside University Health System for postoperative follow-up. Staff there felt that she was continuing to do well five months after surgery. Odom was discharged from the orthopedic surgery clinic at the Riverside University Health System.

44. On April 9, 2021, Odom saw Dr. Lee for an initial addiction medicine consultation. Odom reported that she had been using heroin for the past 11 years, and that her last use was the prior day. Dr. Lee diagnosed her with severe opioid use disorder and began treatment with Suboxone.

45. On May 10, 2021, Odom saw nondefendant Dr. Garcia for a few issues including a request for an eggcrate mattress. Dr. Garcia advised Odom that there was no Durable Medical Equipment order for eggcrate mattresses and medical staff did not provide those anywhere in the CDCR system. Odom acknowledged this indicating she was aware because she had read Title 15. Odom further indicated that she no longer needed an eggcrate mattress because she had been provided with a different mattress from custody staff that was "working great for her."

46. Dr. Feinberg found no documentation of any involvement of Defendant Mitchell in Odom's care. It is possible that Dr. Mitchell denied the referral to orthopedic surgery

1    on August 10, 2015, where Dr. Feinberg was unable to ascertain the signature.

2    However, it is medically acceptable and appropriate for a supervisor to deny a referral

3    when incomplete justification is given, as was the case there as well as when Dr. Singh

4    similarly denied an incomplete referral on September 3, 2019. It is for just such

5    reasons that supervisor approval is required for referrals.

6    47. Based upon Dr. Feinberg's review of the medical records, and his training and

7    experience, it is his professional opinion that Defendants were not deliberately

8    indifferent to her serious medical needs related to hip osteoarthritis. It is his

9    professional opinion that Defendants provided Odom with timely, judicious, and

10   medically appropriate care responsive to her medical needs.

11   48. Odom sued Defendant Dr. Taylor because she did not like telemedicine and disagreed

12   with her about getting a cortisone shot.

13   49. Odom sued Dr. Singh because he was in a supervisory position as the Chief Medical

14   Executive, and specifically because she believed he was on the Reasonable

15   Accommodation Panel that denied her request for egg crate mattress and/or double

16   mattress. Dr. Singh had no direct contact with Odom.

17   50. Odom sued Chief Medical Officer Dr. Mitchell because she claims he examined her

18   hip on one occasion in 2018, but did not make any changes to her care.

19   (*See* Doc. 42-4 (UDF).)

20   **V.    DISCUSSION**

21   Defendants contend Plaintiff cannot prove they were deliberately indifferent to her serious

22   medical needs. (Doc. 42 at 15-16.) Specifically, they argue their collective care of Plaintiff's hip,

23   pain medication, and the denial of an eggcrate mattress were medically appropriate. (*Id*. at 16-19.)

24   Moreover, individually, none of the Defendants were deliberately indifferent to Plaintiff's serious

25   medical needs. (*Id*. at 19-21.) Lastly, Defendants contend they are entitled to qualified immunity.

26   (*Id*. at 21.) As noted above, Plaintiff did not file an opposition to Defendants' motion.

27   Defendants do not argue that Plaintiff fails to meet the first objective prong of the

28   deliberate indifference test. Thus, the central question relevant to all of Plaintiff's claims in this

17

1   action is the second subjective prong of the deliberate indifference test—whether Plaintiff has

2   demonstrated a purposeful act or failure to respond to her pain or possible medical need by

3   Defendants and harm caused by the indifference. *Wilhelm*, 680 F.3d at 1122.

4         Here, Defendants have presented evidence that each of the named Defendants responded

5   to Plaintiff's medical needs consistently and appropriately, and that there is no evidence Plaintiff

6   suffered harm as a result of any indifference by Defendants, demonstrating there is no genuine

7   dispute as to any material fact. Fed. R. Civ. P. 56(a). Thus, the burden shifts to Plaintiff as the

8   non-moving party to establish that a genuine issue as to any material fact actually does exist.

9   *Matsushita*, 475 U.S. at 586. Plaintiff has failed to do so; aside from the allegations of her

10  complaint, she has tendered no evidence to support her claims in this action. Fed. R. Civ. P. 56(c);

11  *Matsushita*, 475 U.S. at 586 n.11.

12        In short, the assertions in Plaintiff's second amended complaint do not establish the

13  existence of any factual dispute. Fed. R. Civ. P. 56(c); *Beard*, 548 U.S. at 527; *McElyea*, 833 F.2d

14  at 197-98. And Plaintiff has completely failed to offer proof concerning one of the essential

15  elements of her Eighth Amendment deliberate indifference to serious medical needs claims.

16  *Celotex*, 477 U.S. at 322.

17        The Court briefly summarizes the evidence offered by Defendants. The Declaration of Dr.

18  B. Feinberg provides nearly all evidentiary support for Defendants' UDFs. Dr. Feinberg serves as

19  the Chief Medical Consultant for the California Correctional Health Care Services (CCHCS)

20  Office of Legal Affairs. (Doc. 42-1, ¶ 3.) He has held the position since February 2017 and

21  regularly reviews medical records and medical procedures related to medical treatment in the

22  correctional setting. (*Id.*) Dr. Feinberg is familiar with the standard of care and skill ordinarily

23  exercised by reputable members of the medical profession providing medical care to patients in

24  CDCR prisons. (*Id.*, ¶ 5.) Dr. Feinberg was asked to review Plaintiff's medical records and to

25  provide his medical-expert opinion concerning her claims that Defendants were deliberately

26  indifferent to her serious medical needs related to hip osteoarthritis. (*Id.*, ¶ 7.) His opinion is

27  based upon his review of Plaintiff's second amended complaint, her deposition testimony, and his

28

analysis of the medical records[3] maintained by CCHCS. (*Id.*, ¶ 8.) In Dr. Feinberg's opinion, Plaintiff's claim that Defendants were deliberately indifferent to her serious medical needs related to his osteoarthritis is not supported by the medical record and that Defendants provided Plaintiff with timely, judicious, and medically appropriate care responsive to her needs. (*Id.*, ¶ 82.) The undersigned finds it appropriate to quote the following directly from Dr. Feinberg's declaration:

> Odom claims on page seven of her Second Amended Complaint that "none of the defendants did anything to delay the progress of my disorder which placed me at a substantial risk by having to have a total hip replacement at an early age when several orthopedic doctors explained to me that a total hip replacement normally is done at a much later/older age due to the lifespan of the artificial joint and the risk of having to have repeat surgeries." However, Odom provides no evidence to support her apparent belief that the course of treatment provided by Defendants did not in fact delay the progression of her left hip osteoarthritis, does not explain what alternative course of treatment she believes could or should have been done to further delay the progression of her left hip osteoarthritis, nor provide any evidence supporting such alternative treatments. While Odom is correct that most total hip replacements are done at older ages, that is because most total hip replacements are done for the wear-and-tear osteoarthritis that occurs over a lifetime of use. Posttraumatic osteoarthritis, as Odom had, makes up a much smaller percentage of hip replacements, even small still those like Odom who had such trauma in childhood with multiple subsequent surgeries. Total hip replacement at an early age was inevitable for Odom. Nonetheless, on the same page of her complaint where Odom takes exception to the early age at which she had her total hip replacement, she also takes exception to waiting several years for surgery rather than having it done at an even younger age. Yet this was precisely the reasons Odom noted regarding the lifespan of artificial joints and risks of repeat surgeries. More importantly, this was at the recommendation of orthopedic surgeon Dr. Galang, who on February 11, 2014 advised that "Due to her age, it is best to treat it conservatively. She will need a total hip replacement in the future." Thus, in 2014, an orthopedic surgeon could already tell that Odom, who was only 34 years old at the time, would need a total hip replacement, just not at that time. In 2019, when an orthopedic surgeon advised that it was now time for the total hip replacement, it was approved and performed, with good results per the surgeons.
>
> Odom further claims, on page nine of her Second Amended Complain, that she was prescribed improper pain medications which did not provide her relief. Odom claims that she was prescribed medications that were on her "allergy list." While this is technically true, it is only because Odom erroneously claimed to have an allergy to these medications when in fact she was repeatedly informed by Defendants and Nondefendants alike that her reactions to codeine and/or morphine were side effects of the medications and not allergic

---

[3] Relevant medical records are attached to Feinberg's declaration as Exhibit B. (*See* Doc. 42-1 at 21-181.)

reactions. Odom also claims that naproxen and ibuprofen did not give her relief and caused her to suffer damage to her kidneys. As explained in paragraph 52 above, this appears to stem from NP Attinello's apparent misinterpretation of kidney tests, which in fact were normal for the entire relevant time period showing no evidence of any kidney damage whatsoever. Moreover, while this interpretation of lab values was incorrect, it by no means would indicate any conscious disregard of any excessive risk to Odom's health. Rather, NP Attinello's subsequent discontinuation of these medications demonstrated due diligence in response to a perceived risk to Odom's kidneys. Furthermore, when NP Attinello began tapering Odom off gabapentin on June 25, 2019, in response to the April 18, 2019 memorandum regarding gabapentin, Odom requested to be placed back on naproxen, suggesting that she had previously found it provided rel9ief. Moreover, there were often long stretches of time, such as from mid-2016 through late-2018, when Odom reported minimal if any pain not well-controlled with her treatment plan. Defendants provided Odom with a large number of different pain medications. It is unclear what other pain medications Odom feels Defendants should have prescribed. It is difficult to assess the subjective complaint of pain in any patients. The treatment of pain is also notoriously difficult in an individual with severe opioid use disorder, such as Odom, who was regularly using illicit heroin during the relevant time period. Unfortunately, Odom withheld that information from Defendants, which could have allowed them to treat her for that condition. Doing so in turn would likely have improved her overall subjective experience of pain.

Lastly, Odom claims on page nine of her Second Amended Complaint that she was improperly denied her requests for a double mattress and/or eggcrate mattress. Yet she provides no evidence to show that she had any medical indication for such accommodations. Rather, she was repeatedly informed by Defendants and Nondefendants alike that she had no such medical indication. Moreover, on May 10, 2021, several months before Odom filed her Second Amended Complaint, Odom reported being aware that eggcrate mattresses ware not provided by medical staff after having read Title 15.

(Doc. 42-1 at 15-17, ¶¶ 83-85.) Defendants' UDF Nos. 2 (partial), 3 through 26, and 28 through 47, are supported by the evidence supporting Defendants' motion. Further, Plaintiff's deposition testimony of March 26, 2024, supports UDF Nos. 2 (partial), and 48 through 50. (*See* Doc. 42-2, Ex. A.)

Simply put, there is no genuine dispute of material fact as concerns the appropriateness of medical care afforded to Plaintiff for treatment of her left hip, the pain medication prescribed, or the denial of an eggcrate mattress. *Farmer*, 511 U.S. at 835, 847; *Estelle*, 429 U.S. at 104; *Wilhelm*, 680 F.3d at 1122; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986). Plaintiff's

dissatisfaction or difference of opinion concerning the treatment afforded by Defendants does not establish Defendants were deliberately indifferent to her serious medical needs. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (prisoner's mere disagreement with diagnosis or treatment does not support a claim of deliberate indifference). Plaintiff has not demonstrated, nor does it appear she could demonstrate, that Defendants knew of and disregarded an excessive risk to her health and safety. *Toguchi*, 391 F.3d at 1057. *See, e.g.*, *Saddozai v. Arqueza*, No. 18-cv-03972 BLF (PR), 2023 WL 4206069, at *10 (N.D. Cal. June 26, 2023) ("Based on the evidence presented, Defendant has shown that there is no genuine issue of material fact with respect to Plaintiff's deliberate indifference to serious medical needs claim. Having filed no opposition, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, or identify with reasonable particularity the evidence that precludes summary judgment. Accordingly, Defendant is entitled to judgment as a matter of law" [citations omitted]); *Jaimes v. Barnes*, No. 1:14-cv-00952-LJO-SAB (PC), 2017 WL 1398837, at *7 (E.D. Cal. Apr. 19, 2017) ("It is undisputed … that Dr. Barnes ordered the appropriate diagnostic tests and medication. Therefore, because Dr. Barnes provided reasonable and appropriate treatment …. Dr. Barnes actions in ordering an x-ray and prescribing appropriate pain medication militate against a finding he purposefully ignored, delayed, or failed to respond to Plaintiff's medical needs. Furthermore, Plaintiff has simply failed to present any evidence that the treatment provided by Dr. Barnes was inadequate or rose to the level of deliberate indifference"); *Tillisy v. Baird*, No. 2:12-CV-02055-TSZ-BAT, 2013 WL 7017957, at *1 (W.D. Wash. Nov. 25, 2013) ("Mr. Tillisy has filed no opposition to defendants' motions for summary judgment and, because Mr. Tillisy has declined to present any evidence or argumentation to the contrary, defendants' facts are accepted as undisputed. The Court recommends [granting] defendants' unopposed motions for summary judgment because they have demonstrated that Mr. Tillisy's allegations do not entitle him to relief"); *Orona v. Calderon*, No. C 95-4249 FMS, 1997 WL 61277, at *3 (N.D. Cal. Feb. 6, 1997) ("Because plaintiff has filed no opposition and presented no additional evidence concerning the essential elements of his claims, defendant's motion for summary judgment is granted").

In sum, on this record, no rational trier of fact would find for Plaintiff as there is no

1    genuine issue for trial in this matter. *Matsushita*, 475 U.S. at 587. Defendants are entitled to

2    summary judgment.[4]

3    **VI.    CONCLUSION AND RECOMMENDATION**

4    Based on the foregoing, it is **HEREBY RECOMMENDED** that:

5    1.  Defendants' motion for summary judgment (Doc. 42) be **GRANTED**; and

6    2.  The Clerk of the Court be directed to enter judgment in favor of Defendants Taylor,

7          Khoo, Attinello, Ezenwugo, Mitchell and Singh.

8    These Findings and Recommendations will be submitted to the United States District

9  Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  **Within 14 days**

10  after being served with a copy of these Findings and Recommendations, a party may file written

11  objections with the Court. Local Rule 304(b). The document should be captioned, "Objections to

12  Magistrate Judge's Findings and Recommendations" and **shall not exceed 15 pages** without

13  leave of Court and good cause shown. The Court will not consider exhibits attached to the

14  Objections. To the extent a party wishes to refer to any exhibit(s), the party should reference the

15  exhibit in the record by its CM/ECF document and page number, when possible, or otherwise

16  reference the exhibit with specificity. Any pages filed in excess of the 15-page limitation may be

17  disregarded by the District Judge when reviewing these Findings and Recommendations under 28

18  U.S.C. § 636(b)(l)(C). A party's failure to file any objections within the specified time may result

19  in the waiver of certain rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

20  IT IS SO ORDERED.

21    Dated:   **December 3, 2024**

22                        UNITED STATES MAGISTRATE JUDGE

---

[4] Because the Court has found that Defendants are entitled to judgment on the merits, the Court does not reach Defendants' alternative argument that they are entitled to qualified immunity.

22